Yes, Your Honor. Case number 21-2581 Northern Iowa, United States v. Anthony Redman. Please proceed.  May it please the Court. Ms. Dupuy, I'm John Jacobson. I'm here through my appointment of the CJA panel to represent Mr. Anthony Redman. The basis of this appeal is a motion to suppress file on his behalf of a stop of his person on November 26th of 2019. It is a call to dispatch in Cedar Rapids, Iowa of shots fired at a Motel 6 in the back area of this location. Parole Officer Smith, who is employed by the Iowa Department of Corrections 6th Judicial District, heads that way. He's on his parole duties on the high-risk unit. Parole Officer Smith is advised by the attendant that there was potentially shots fired in the back area of the Motel 6. The Motel 6 is a location where all rooms enter from the outside area. What is important to understand in this premise is that the information provided to authorities at that time. There's no identification of a person. There's no identification of a gender, of a race, the number of people, the vehicle being involved, or any other identifiers to specify what is being sought and or desired. Again, when Parole Officer Smith arrives, he is simply there based upon his purported parole duties. How many, is it in the record, if there were other vehicles present, other people present in that parking lot? Your Honor, in the record, I believe the information is provided there was minimal folks located. It was very, very early morning hours. Shortly after midnight, into the 26th, and so the number of individuals present at that time, fairly limited, I would say. Well, what would have prevented or made it improper for the officer to approach the vehicle and begin to inquire of the occupants? I don't think there's anything that prohibits any of the bench here, Mr. Puyer, myself, or Parole Officer Smith from approaching that car. I think Parole Officer Smith have to direct or to require something of the individuals and the occupants of that vehicle. Well, won't that be determined once the conversation begins, as opposed to prior to his actually beginning to converse? Part of the argument that I made to this Court, and that was done at the time of the District Court, was whether or not, what exactly was Parole Officer Smith doing there? Is he operating in his parole duties? Did she challenge his entitlement as a parole slash peace officer to be able to, was that argued before the District Court? It was discussed and it was in the exhibit, one of the, two of my exhibits related to what duties parole officers have and how they can be construed as law enforcement officers. But was his lawful authority challenged at that point? I believe through those actions, yes, it was. I wanted to follow up on that, Counsel, because you did cite to the statute that says he has to be operating as a parole officer, but it wasn't really argued. So I guess it's a little fuzzy whether we can consider that on appeal. I certainly understand the Court's position. I think there's sufficient questioning to raise that issue. I think it's also secondarily important for the context of how it is that even if this Court finds that there was in fact no stop and no detention by Parole Officer Smith, I still think the issue becomes, there's still this Sergeant Martin who actually then physically detains my client and tackles him to the ground. And the government argues that there was no seizure of Mr. Redmond until that happened. How does that affect your argument? Well, I think at some point we still have a seizure by Sergeant Martin. And I would say the same things for Sergeant Martin. Sergeant Martin is sent there based upon If it may be an attempted seizure, but he hadn't grabbed him, he hadn't pulled a gun on him, he simply told him to stop. Correct. Sure. Well, what case says that that by itself constitutes a seizure? I'm not necessarily contending that that is a seizure, because the Court said that there is not a seizure. I think you have to consider what information was obtained and held by and what he then relayed to Sergeant Martin. Because if Parole Officer Smith is then imparting other additional information to Martin, I think that changes the scope and the view of it. But that doesn't happen. The only thing coming from Parole Officer Smith is a statement to Sergeant Martin that says, I said he couldn't leave. Mr. Redmond leaves in any event, even though in light of these statements by Parole Officer Smith. I think what becomes the issue then, what does Sergeant Martin know if that really becomes the crux of the actual physical detention? Sergeant Martin arrives. He's told by an Uber driver or some unassociated person that it could have been fireworks. Sergeant Martin goes to this back area of this parking lot. Parole Officer Smith says, he's not free to go. Parole Officer Smith's statement that he's not free to go should carry no greater weight than anyone here in this courtroom saying that same exact phrase. Sergeant Martin doesn't smell marijuana. He doesn't himself note of any open... Why shouldn't it carry some weight? Excuse me? Why shouldn't it carry some weight if the person is lawfully there investigating a potential crime? Again, it goes back to the idea that he's not a police officer. So if I had said that person did A, B, or C, I think that's, it carries that same weight. Well, the government also argues that he wasn't seized. So if he wasn't seized, why would it matter if someone told him that he couldn't leave? Again, I think the ultimate issue becomes that there's this secondary detention. And so I think that if it doesn't matter, there's still a detention of my client prior to entering the hotel room, the motel room. And again, in order to detain, we have to have reasonable and articulate suspicion. Again, thinking about again what Sergeant Martin knows, shots fired, but this is already diminished because at this point he's been told by someone, another individual, that it was potentially fireworks. He doesn't have identification of man or woman, race, ethnicity, many people, a vehicle, anything of that sort. And so in order to then figure out what are those specific facts, as the government argued, Sergeant Martin was justified in stopping a defendant to investigate the reports of shots fired. Well, the problem, he can certainly investigate, but the level of which he investigates is not simply an investigation. He's detaining Mr. Redman, who he doesn't know from Adam. He doesn't have any idea who this person is, and simply tackles him as he enters. And then the state, the government goes on to then talk about ... Well, Counselor, he does know that there's a report of shots fired. And he knows that someone's leaving the scene. Is that enough? I don't believe so. Not to the extent of what's occurred. And then further, again, the government goes on, the totality of the circumstances, well, because he had reasonable suspicion that the defendant was armed and dangerous. There's no facts in the record to support that Anthony Redman was ever armed and dangerous. He was an African-American man in a parking lot at a Motel 6, where purportedly, potentially shots were fired or fireworks occurred. And so again, I don't think there's not sufficient information to support this level of entry into the privacy and into the person of Mr. Redman. I'll reserve my last two minutes for my rebuttal. Thank you. Thank you, Mr. Jacobson. Good morning. Please proceed. Good morning. May it please the court, my name is Liz Dupuy. I'm an Assistant United States Attorney for the Northern District of Iowa. I'd like to answer Your Honor's question posed regarding the number of people present at the scene. In the suppression hearing transcript, which is docket 38, or I'm sorry, yes, docket 38 on page 36, Officer Smith testified the only two individuals were in the car, as well as the auditor of the Motel 6, as well as Government's Exhibit 2. You can see from Sergeant Martin's body camera as he's pulling in, those are the only two individuals in the parking lot. Counsel, you argue in your brief that there was no seizure here until Sergeant Martin grabbed Mr. Redman. Yes, Your Honor. If that's correct, why wouldn't it be perfectly legal for Mr. Redman to walk away from a consensual encounter with the other person? Thank you, Your Honor. The defendant was walking away from Officer Smith at the time they were speaking. There was no detention. And Officer Smith was entitled to investigate based on the odor of marijuana and the shots fired, as well as the open container. I'm talking about Sergeant Martin. Yes. What was the basis for Martin to seize Redman? The basis for Sergeant Martin to seize the defendant was the following. First, he was responding to the shots fired call, which was Government's Exhibit 1. He testified the Cedar Rapids Police Department received the call for a shooting at the Motel 6. The second basis was it was a transient area with a number of calls for service with criminal activity. He testified to that. He also testified it was dark outside. There were no other suspects in the area. The defendant was walking towards a motel room with unknown occupants. That might be cause to stop and talk to him, but would it be reasonable suspicion to perform a Terry stop under our precedent? Yes, Your Honor. There was reasonable suspicion to perform a Terry stop. There was reasonable suspicion that criminal activity was afoot because the defendant was the only individual in the parking lot where they had just heard that there was shots fired call in that exact location. So it's a proximity argument? In part, it's a proximity argument. In part, it's him arguing and refusing to comply with Officer Smith, who is simply attempting to engage him in conversation. Is that a violation of law? The basis of our argument is that the interference with official acts was with respect to Sergeant Martin. Now, an argument could be made that the defendant was also interfering with official acts based on Officer Smith. However, that's not the basis for our stop. In addition, Sergeant Martin testified that he was concerned for the safety of himself, the other officers there, as well as the public. Counselor, I'm concerned that the argument in your brief almost seems to take the position that an officer can create reasonable suspicion by demanding that someone stop, and then when they don't stop, they seize them. Where am I wrong in that? Thank you, Your Honor. The reasonable suspicion is not based on Sergeant Martin grabbing his jacket and him described as bull rushing into the hotel room. The reasonable suspicion developed well before that, as Sergeant Martin is attempting to engage in conversation, and he's moving towards a hotel room with unknown occupants, presenting a danger to the other individuals in the area, as well as being in the location of an urgent… I don't have articulable facts of the reasonable suspicion of criminal activities. Moving towards a hotel room with criminal activity? He's moving towards a hotel room where they had just received a 911 call explaining a bunch of shots from the backside of the motel had rung out. That's Government Exhibit 1. Well, it seems to me you have to have something more than a person approaching their hotel room. Thank you, Your Honor. In addition to him approaching the hotel room, refusing to engage in conversation, arguing with Officer Smith, it's also, as I described, a situation… It's got to be suspicion of criminal activity. Neither of those things are criminal. Thank you, Your Honor. The suspicion of criminal activity is the attempt to investigate him for being in the area where a call just came out where there were shots fired. That's the suspicion of criminal activity. It's not an independent assessment based on some…we're not arguing based on marijuana. We're not arguing based on an open container. It is the shots fired. So there was no observation at that moment that justified the act? I mean, something the officer became aware of upon arrival that entered into this calculus of I need to take this person down. The facts we know from the record that Sergeant Martin knew upon his arrival were as soon as he arrived, he knew that Officer Smith needed help. He testified to that. He testified that he was responding to the call, which I mentioned. He testified that it was a transient area. It had a lot of calls for service. It was a high crime area. It was dark outside. He couldn't see very well. He testified that the defendant was walking towards the hotel room. He was concerned. He was concerned that there was someone else in the hotel room, which if you look at government's exhibit, I believe it's two, you can actually see there is someone else in the hotel room. He testified that… Or is concerned for what was the connection of there being someone in the hotel room? Thank you, Your Honor. He testified that he was concerned for the safety issue posed by an unknown occupant of the hotel room who could have potentially access to weapons or any other possibility unknown to him. So as soon as that door is open, he doesn't… Well, if he's concerned for the person in the hotel room, why do you tackle the person that's walking towards it? His concern is that that raises an additional problem for the safety of the individuals in the area, that now there's a second unknown person that they have to focus their attention on. So he's attempting to investigate the defendant for the shots fired call. And then him bull rushing towards the room is posing an additional safety threat. That's what he testified. Bull rush toward the room, that was an interesting description. Because typically I hear or have used that phrase in relation to an aggressive act towards someone, not in a direction away from someone. Yes, Your Honor. And that was Sergeant Martin's description at the hotel room, or at the suppression hearing. And obviously from Government's Exhibit 2, you can see that he's saying, hey, hey, whoa, and grabbing his jacket, and the defendant is determined to get into that room. And so the struggle ensues. And you can hear Sergeant Martin saying on the video, stop resisting, stop resisting. Which is, again, why it's an interference with official acts. And again, the search and seizure of the handgun is then a search incident to arrest. If there are no other questions, yes. Is it illegal under Iowa law for someone to keep walking when an officer tells them to stop walking? Is that interference with official acts? That seems to be what the argument is. I don't believe the government's position would be that an individual on the street who ignores an officer's request and walks away, that that would be an interference. No, I believe under Iowa. What was the official act that was being interfered with? The official act was him attempting to investigate the shots fired, call, and grabbing him on the jacket and the defendant physically pulling away and resisting. That was the interference with official acts. His official act being to investigate the call. What's your response to the arguments about the parole officer's presence and conduct and authorization? Thank you, Your Honor. The government's position is that regardless of Officer Smith's status under 906.2, that it doesn't matter because he never sees the defendant and because his authority doesn't determine the lawfulness of Sergeant Martin's actions under Bell. So it really doesn't matter what Officer Smith's authority is. Now, Officer Smith's authority wasn't fully developed as part of the record because it wasn't brought up until the defendant objected to the R&R. So the facts that we have don't adequately determine Officer Smith's authority. But the government's position is that it's completely irrelevant because he never sees the defendant and because under Bell, it doesn't matter. But you don't really contend that the second officer's conduct would have occurred in the way it did in his absence, do you? We would concede that one of the factors considered by Sergeant Martin was the defendant refusing to comply with Officer Smith. That was one of the many factors that Sergeant Martin considered when he attended. But if you take out Smith's status, then the person that's there would just be treated as a passerby or any other civilian. And if a civilian tells someone to stop, how would an arriving officer put that in a calculus for their ability to effectuate a physical arrest? Thank you, Your Honor. If it had been just a regular individual asking the defendant to stop and Sergeant Martin had arrived, that may be one factor that he would consider if the defendant was obstinate or aggressive or argumentative. However, in our circumstance, that was only one of the many factors that Sergeant Martin considered when he considered that the defendant was not listening to Officer Smith. It was only one of, you know, approximately ten factors that enabled him to maintain. I guess where I'm going is it seems it's kind of hard to take this individual out as not having some legal authority. Because once you've just got a passerby or a bystander or just an average citizen, you've got a different scenario for the second arriving officer. Thank you, Your Honor. I understand the government's position would be that regardless of his lawful authority, it just doesn't determine the lawfulness of Sergeant Martin's actions under the Fourth Amendment under Bell. And if there are no other questions at this time, we would respectfully request that you affirm the district court's order denying defendant's motion to suppress. Thank you. Thank you, Mr. Pui. I please the court, Mr. Pui again. Counsel, do we know from the record whether Sergeant Martin knew that Officer Smith was a probation officer or could he have reasonably believed that he was a police officer? Could Sergeant Martin have reasonably believed that Smith was a police officer? Or did he know he was a probation officer? I can believe I would have that answer, and that would be that because of the size of Cedar Rapids and the frequency of which I even see Pro Officer Smith. But the record doesn't. But the record does not specifically go to that point. He was uniformed. Is that correct? He was, yes. So the parole officers, they wear like a dark polo. They have like high risk on their armbands or on their sleeves. They're not as detailed in terms of the badging as a general, no offense, as a regular police officer would be or someone who is operating in that capacity. Just one, two little things I wanted to point out is that it seems like what we've affected, what the government tries to argue is that any time that someone is in an area of ill repute, that somehow we immediately attach some sort of reasonable suspicion of criminal activity being afoot. Again, we talk about it being a transient area, a high crime area. That's a generalized idea of this location. And then the generalized idea of what happens if and when Mr. Redman would have made it in the room. That's not specific to these facts and to this person and to this encounter between Mr. Redman and Sergeant Martin. So what we have ultimately is a hunch. We have a belief that something has happened here in this hotel, on this back part of this motel, and ultimately what happened there is then also clearly diminished before Sergeant Martin ever arrives. And Sergeant Martin knows this because he's told by the Uber driver. So all we have is a hunch, and that hunch is not going to suffice to allow the detention and seizure of my client to occur. We would ask that the court remand back to the district court. Well, the question I sort of have in my mind, given the totality of the circumstances, would these officers have been derelict in their duty had they not done what they in fact ended up doing? I mean, that's a philosophical question, I guess. In other words, at this time of the morning and, well, anyway. Well, again, I certainly appreciate the officers investigating. I think the manner and the degree of which they investigated and defined their focus on these two individuals, and ultimately this one individual, I think that is a bridge too far, as the Honorable District Judge C.J. Williams would say on something, and that's where we are in this case. Thank you. Be well. Thank you, Mr. Jacobson. Thank you also, Mr. Pui. The court appreciates both counsel's arguments to the court this morning. We'll continue to study the materials and render a decision. Thank you much. Thank you. All right. Madam Clerk, I believe that concludes the scheduled arguments for today. Is that correct? Yes, it does, Your Honor. All right. That being the case,